(C. D. 731)

Little Joe Wiesenfeld Co. *v.* United States

United States Customs Court, First Division

(Decided February 13, 1943)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Daniel I. Auster, Joseph B. Brady,*
and *Richard F. Weeks,* special attorneys), for the defendant.

Before Oliver, Walker, and Cole, Judges

Walker, Judge: Two kinds of merchandise are covered by this protest, and for the purpose of clarity, each will be taken up separately. The first kind of merchandise the classification of which is in dispute is described on a commercial invoice found with the papers as "saddles," and on the consular invoice as "Leather riding saddles without stirrup irons or girth straps." One hundred saddles were so invoiced, out of which 19 were described by the appraiser in his return on the invoice as "saddle seats Imit. Pigskin," with advisory classification under paragraph 1531 at the rate of 25 per centum ad valorem. This advisory classification was adopted by the collector, and duty was consequently assessed under the provision in that paragraph, as modified by the British Trade Agreement, T. D. 49753, for "manufactures of leather * * * or of which leather * * * is the component material of chief value, not specially provided for." It is claimed in the protest, or by timely amendment thereto, that said articles are properly dutiable at the rate of 15 per centum ad valorem under the last clause of paragraph 1530 (f) of the Tariff Act of 1930, providing for "saddles * * *, not specially provided for, parts

thereof, except metal parts," or, alternatively, at the rate of 20 per centum ad valorem under either the provision in said paragraph 1530 (f) as modified by the British Trade Agreement, *supra*, for "saddles made wholly or in part of pigskin or imitation pigskin," or the provision therein for "saddlery."

The articles in issue, described by the appraiser as above set forth, are represented by exhibit 1 in evidence before us. It consists of what might be termed a bare saddle, consisting of a seat, flaps, and pads, all joined together not ready to be used in its imported condition without the addition of what have been described as "fittings," or stirrups, stirrup leathers, and girth.

The issues before us with respect to exhibit 1 are three: First, is exhibit 1 in its imported condition a "saddle" within the meaning of that term as used in paragraph 1530 (f)? If so, it would take classification under the provision for "saddles made wholly or in part of * * * imitation pigskin," or, in the event that it should be determined not to be in part of imitation pigskin, under the provision in said paragraph 1530 (f) for "saddles * * *, not specially provided for," there being no apparent dispute that saddles such as exhibit 1, whether bare or complete, are valued at $40 or less.

Second, is exhibit 1 made in part of pigskin? If the answer to this question is in the negative, then, conceding that exhibit 1 is only a part of a saddle it would take classification under the provision for parts of such saddles as are not specially provided for under paragraph 1530 (f), *supra*.

Third, if it should be determined that exhibit 1 consists of a part of a saddle made in part of imitation pigskin, is it entitled to classification under the provision for "saddlery" in said paragraph 1530 (f)?

Before proceeding further, an examination of the provisions of the tariff act, both as originally passed and as modified by the British Trade Agreement, with regard to saddles, saddlery, and parts is in order. Paragraph 1530 (f) covers, among other things, the following groups of articles at the rates indicated:

| | | As originally passed | As modified by the Br. Trade Agmt. |
|---|---|---|---|
| Group I | Saddles valued at more than $40 ea.. Saddlery, Parts (except metal parts) for any of the foregoing. | 35% | 20% |
| Group II | Saddles made wholly or in part of pigskin or imitation pigskin. | 35% | 20% |
| Group III | Saddles, not specially provided for, Parts thereof, except metal parts. | 15% | 15% |

It will be noted that although three kinds of saddles are provided for, viz, saddles valued at more than $40 each, saddles made wholly or in part of pigskin or imitation pigskin, and saddles, not specially provided for, there is provision for parts for only two of these kinds,

namely, parts of saddles valued at more than $40 each, and parts of such saddles as are not specially provided for. The only other provision in paragraph 1530 (f) into which parts of pigskin saddles might fall is the provision in group I for "saddlery."

Taking up, first, the question of whether exhibit 1 in its imported condition is a saddle or merely a part of a saddle, we note that in *Goetz Saddlery Co. et al.* v. *United States*, T. D. 46490, it was held on the record therein made that the term "saddle" as used in paragraph 1530 (f), *supra*, meant the bare or naked saddle together with the girth, stirrup leathers, and stirrup irons; in other words, a "complete" saddle.

In the case at bar Henry M. Wiesenfeld, who stated he had been engaged in the saddlery business for 13 years, and who, it appeared, had been one of the witnesses who testified in the *Goetz* case, stated that there are two meanings for the word "saddle" in his business. In connection with sales to the wholesale or retail trade, he said, the term meant a saddle complete with stirrups, stirrup leathers, and girth, but in connection with purchases from manufacturers of saddles it meant an article such as exhibit 1, without fittings. This testimony is in agreement with that of Edward J. Henle, a witness for the plaintiff, who had an experience of 20 years in the saddlery business.

On this issue Howard H. Vordenberge, a witness for the defendant, with 22 years' experience in the saddlery business, both manufacturing and selling, stated that exhibit 1 was a saddle, but not complete with fittings. Witness Milton F. Nafey, with 50 years' experience in the saddlery business, testified that his firm would list exhibit 1 as a "saddle without fittings," although both he and witness Joseph B. Kopf, also of 50 years' experience in the saddlery business, stated that exhibit 1 would be known as a saddle in their business. It should be explained, however, that both of the latter witnesses were engaged in the manufacture of saddles and saddlery, and it therefore appears, when considered from that standpoint, that their testimony is not out of line with that of witnesses Wiesenfeld and Henle, who stated that in dealing with manufacturers of saddles a bare saddle, such as exhibit 1, would be considered a "saddle."

In our view the foregoing testimony does not in the least impair the holding in the *Goetz* case as to the meaning of the term "saddle" as used in paragraph 1530 (f). First of all, except for one question asked on cross-examination of the witness Wiesenfeld, none of the witnesses purported to give the meaning of the term at and prior to the passage of the Tariff Act of 1930. The question asked Mr. Wiesenfeld referred to his sales of saddles, and was a follows:

X Q. I am referring to the fellow who buys from you in wholesale quantities in the ordinary course of trade in the United States, and who did so prior to 1930.—A. He would be buying complete saddles with all the fittings.

Second, it would appear that as commonly understood by all except saddle manufacturers, the term "saddle" meant a saddle complete with fittings. Third, if it be contended that the commercial meaning of the term differed from the common meaning, based upon the manufacturers' understanding of the term, such meaning has not been established at and prior to the passage of the Tariff Act of 1930, nor has it been shown to be uniform, definite, and general—in fact, the contrary appears since it apparently had two separate meanings when dealing with manufacturers on the one hand and with others in the wholesale trade on the other hand.

Following the holding in the *Goetz* case, therefore, we hold that the articles represented by exhibit 1 were not, as imported, "saddles" within the meaning of that term as used in paragraph 1530 (f), but were merely parts of saddles.

With reference to the second question presented as to the articles represented by exhibit 1, namely, whether or not they are in part of imitation pigskin, we find that plaintiff's witness Wiesenfeld stated that although exhibit 1 was marked with a grain it was not in imitation of pigskin. Plaintiff's witness Henle stated that the leather was rough-grained, but did not show the dotted imitation hair-mark of imitation pigskin. Defendant's witness Vordenberge stated that the leather of the seat of exhibit 1 was a printed leather, "what they call a pebble grain," but stated that it was not imitation pigskin nor did it simulate pigskin.

Opposed to this testimony is the testimony of four of defendant's other witnesses. Martin Kliemand, a witness with some 22 years' experience in the leather business, including the purchase and sale of pigskin and imitation pigskin leather, stated that in his opinion the seat and certain other portions in back of and below the seat, of exhibit 1 were made of imitation pigskin. To the same effect is the testimony of Dennis P. Shea, a salesman and office manager for a leather firm of 19 years' experience. Witness Nafey, whose experience in the saddlery business has already been referred to, stated that in his opinion the seat of exhibit 1 was made of imitation pigskin leather, although he admitted it to be a poor imitation, and witness Kopf, likewise of long experience in the saddlery business, stated that in his opinion the seat and back of the saddle were imitation pigskin. He stated on cross-examination that certain parts of the seat were stretched in manufacture, which caused some of the embossed or printed imitation pigskin marks to disappear, but that it was nevertheless an imitation pigskin.

We think the preponderance in weight of the testimony on this issue is in favor of the defendant, and therefore find that the articles at bar are parts of imitation pigskin saddles.

Having so found, the next question is whether they are more properly described under the provision for "saddlery" in paragraph

1530 (f), as modified, *supra*, or under the provision for manufactures of which leather is the component material of chief value in paragraph 1531, as classified by the collector.

Defendant contends that by reason of the decision in the case of *Wyman* v. *United States*, 13 Ct. Cust. Appls. 241, T. D. 41198, parts of saddles are excluded from the scope of the term "saddlery" as used in the tariff act. We do not agree with this contention as applied to the merchandise at bar. It is noted that the *Wyman* case involved the 1922 tariff act provisions which were revised in the Tariff Act of 1930. In the former act it appears that there were provisions for saddlery and for parts of saddles, and in reaching its decision the court said:

As commonly understood, "saddlery" means either saddles and whatever belongs to them collectively or *all leather articles and fittings used about horse furniture or for the equipment of horses.* See "Saddlery"—New Standard Dictionary and Century Dictionary. Webster's New National Dictionary defines "saddlery" to be "the materials for making saddles and harness; *the articles usually offered for sale in a saddler's* shop."

Taking into consideration that harness and saddles are particular kinds of saddlery and were with their nonmetallic parts specifically enumerated in paragraphs 1436 and 1606, it is apparent that Congress·intended that in both paragraphs the designation "saddlery" should include all articles and fittings used as horse furniture or equipment not covered by the designation "harness, saddles, and part thereof." In other words, Congress having expressly provided for harness, saddles, and parts thereof, it can hardly be assumed that there was a legislative intent to provide for the very same tariff entities under the designation "saddlery." [Italics quoted.]

From the foregoing it appears that the only reason why parts of saddles were excluded from the scope of the term "saddlery" in the *Wyman* case was that they were both equally specially provided for in the 1922 act, and "parts of saddles" was a narrower term than "saddlery." However, in the 1930 act, both as passed and as modified, there is no provision for parts of pigskin or imitation pigskin saddles, and it would certainly appear, therefore, that the term "saddlery" is narrower and more specific as applied to such articles than the provision for manufactures of which leather is the component material of chief value. It is true that the *Wyman* case was apparently followed in the *Goetz* case, decided under the 1930 act, but there the question was in a sense moot, as that case involved merchandise imported prior to the effective date of the British Trade Agreement when the rate applied to saddlery was the same as that applied to manufactures of which leather is the component material of chief value, namely, 35 per centum.

We therefore hold that the articles represented by exhibit 1 are properly dutiable at the rate of 20 per centum ad valorem under the provision in paragraph 1530 (f), as modified by the British Trade

Agreement, T. D. 49753, for "saddlery." That claim in the protest is therefore sustained.

With respect to the other items in question, all assessed with duty at the rate of 25 per centum ad valorem under paragraph 1531, as modified, as manufactures of which rawhide or leather is the component material of chief value, we find the following exhibits were offered and received without objection representing the items named:

| Exhibit | Invoice description | Entry |
|---|---|---|
| 2 | 30—3″ folded leather girths | 1388 |
| | 3—3″ rawhide girths | 1202 |
| 3 | 10 "Princess" leather girths | 1202 |
| 4 | 30 pr. 1¼″ sq. edge stirrup leathers | 1388 |
| Ill. 5 | 3 pr. boys' 1″ stirrup leathers | 1202 |

These articles are claimed to be properly dutiable at 15 per centum ad valorem under the last clause of paragraph 1530 (f), as modified, *supra*, or, alternatively, under the provision for "saddlery" in the same paragraph, as modified, at 20 per centum.

With respect to these items Mr. Wiesenfeld testified that they were used, according to his experience, almost exclusively with cowhide saddles as distinguished from saddles of pigskin or imitation pigskin, and that such saddles with which they were used were always valued at less than $40 each, being low-priced parts for use with low-priced saddles. The girths and stirrup leathers used with pigskin or imitation pigskin saddles, he said, are in almost all cases of a higher quality than those represented by the exhibits. Of similar import is the testimony of those of the witnesses who were in the saddlery business, namely witnesses Henle, Vordenberge, Nafey, and Kopf.

From the foregoing we are satisfied that the items represented by exhibit 2, 3, 4, and illustrative 5, are not parts of saddles valued at more than $40 each, nor are they parts of saddles made wholly or in part of pigskin or imitation pigskin, and they are therefore properly dutiable at the rate of 15 per centum ad valorem under the provision in paragraph 1530 (f), as modified, for parts of such saddles as are not specially provided for.

To the extent indicated the protest is sustained, and judgment will issue directing the collector to reliquidate the entries accordingly.